651 So.2d 933 (1995)
COMMERCIAL UNION INSURANCE COMPANY, Plaintiff-Appellee,
v.
STATE of Louisiana, WORKER'S COMPENSATION SECOND INJURY BOARD, Defendant-Appellant.
No. 94-1202.
Court of Appeal of Louisiana, Third Circuit.
March 1, 1995.
*934 Kay Hilgerson Michiels, Alexandria, for Commercial Union Ins. Co.
Karl Leslie Scott, Baton Rouge, for Louisiana Worker's Comp. Second Injury Bd.
Before PETERS, AMY and SULLIVAN, JJ.
AMY, Judge.
This action was commenced after the Louisiana Worker's Compensation Second Injury Board (hereafter "the Board") denied a claim filed by plaintiff, Commercial Union Insurance, to recoup benefits paid to and on behalf of Mr. Percy Loftis. Commercial Union sued the Board and a hearing was set before a worker's compensation hearing officer. The hearing officer rendered judgment in favor of Commercial Union, ordering reimbursement by the Board. The Board perfected this appeal. We reverse.

*935 FACTS
Mr. Loftis worked for Mr. Kenneth Moran as a truck driver for a brief period during the early 1970s. In 1990, Mr. Moran rehired Mr. Loftis as a truck driver. On or about April 18, 1990, Mr. Loftis attempted to deliver a load of logs to the Pineville Mill. After the load was rejected, Mr. Loftis climbed on top the pile to rearrange the logs. When his pants leg became caught, he tripped and fell from the truck onto the ground. Although Mr. Loftis' head did not strike the ground, he bumped his head.
The following day, Mr. Loftis sought medical treatment at the Rapides General Hospital emergency room for aches in his legs and tenderness in the lumbar and cervical regions. Later when Mr. Loftis began to experience headaches and pain in his neck and lower back, he sought medical treatment from Dr. D.A. Waldman. After examination, Dr. Waldman's impression was cervical and lumbar strain. He recommended physical therapy.
On July 30, 1990, Mr. Loftis reported pain along his back, his neck, and his left arm to Dr. Waldman; however, an MRI was negative. On September 4, 1990, Dr. Waldman referred Mr. Loftis to Dr. J. Frazer Gaar. Mr. Loftis complained to Dr. Gaar of persistent aching and soreness in his lower back, hips, and legs; pain radiating into the interscapular area and the posterior neck; weakness in his left arm; frequent headaches; and insomnia. Dr. Gaar's examination failed to reveal any objective evidence of spinal cord compression or peripheral nerve root irritation. His conclusion was that Mr. Loftis had probably sustained a contusion and that this injury was being adequately treated by Dr. Waldman.
On October 2, 1990, and November 20, 1990, MRIs of Mr. Loftis' cervical spine were negative; nevertheless, his complaints persisted. On January 7, 1991, after eight months of treatment, Mr. Loftis still complained of pain in his back and neck.
On January 22, 1991, Dr. Waldman received a note from Dr. Gaar that an orthopaedic examination of Mr. Loftis failed to reveal evidence of cervical cord compression or peripheral nerve root irritation. On February 12, 1991, Mr. Loftis saw Dr. Waldman and complained of pain along his back and headaches. Dr. Waldman noted that neither medication nor therapy had helped this patient, and that Dr. Gaar had seen him and found no objective evidence of problems, and his MRI of cervical lumbar spines was negative. Dr. Waldman noted that Mr. Loftis thought something was wrong with his liver or kidneys. Dr. Waldman found no reason for further orthopedic care and discharged Mr. Loftis.
On June 4, 1991, Mr. Loftis returned to Dr. Waldman complaining of neck problems, even though his MRI was negative. On July 8, 1991, Mr. Loftis saw Dr. C.B. Fresh for a neurosurgical consultation. Dr. Fresh's assessment was post-traumatic chronic neck pain and headaches.

PROCEDURAL HISTORY
Commercial Union, as Moran Trucking's worker's compensation carrier, began to pay benefits to Mr. Loftis on May 16, 1990. Commercial Union filed notice of a claim for reimbursement with the Board in which it alleged that Mr. Loftis had a pre-existing permanent partial disability.
Commercial Union sought reimbursement based on injuries sustained by Mr. Loftis in January of 1980. The 1980 accident occurred while Mr. Loftis was working in the logging industry. A tree which he was cutting down crashed onto a trailer and then bounced up and struck him in the head. After Mr. Loftis lost consciousness, he was brought to Rapides General Hospital where he was evaluated, x-rayed, and then discharged. Mr. Loftis subsequently saw Dr. T.E. Banks, Jr., for neck discomfort and tingling in his right hand which he alleged resulted from this accident. Dr. Banks referred Mr. Loftis to Dr. John Patton. Mr. Loftis initially saw Dr. Patton on April 9, 1981, complaining of tingling discomfort in his right hand. Dr. Patton's examination revealed that there was weakness in Mr. Loftis' right hand grip. His assessment was possible cervical muscoskeletal injury with a slight possibility of cervical disc disease.
*936 Mr. Loftis returned to Dr. Banks on April 30, 1981, complaining of tingling in all extremities. On May 5, 1981, Dr. Banks hospitalized Mr. Loftis for cervical tomograms and a cervical myelogram. The cervical myelogram indicated a small bulge anteriorly at C-2,3 on one of the lateral projections; however, repeat lateral projections as well as oblique and AP projections failed to demonstrate any significant spinal cord or nerve root compression. On May 11, 1981, Mr. Loftis returned to Dr. Banks complaining of tingling in his extremities. Dr. Banks' assessment was possible C-2,3 herniated nucleus pulposus.
On June 8, 1981, August 24, 1981, and October 6, 1981, Mr. Loftis returned to Dr. Banks, still complaining of tingling in his extremities. On October 27, 1981, Mr. Loftis saw Dr. Banks. Although he did not complain of tingling in his extremities, he complained of occipital-type headaches and neck pain. Dr. Banks' assessment was possible early cervical osteodegenerative disease, but he noted that there was no evidence of neurological abnormalities. On December 29, 1981, Mr. Loftis returned to Dr. Banks, complaining of neck pain with pain radiating down the interscapular region. Mr. Loftis indicated to Dr. Banks that he occasionally experienced a shocking sensation. On February 23, 1982, Mr. Loftis returned to Dr. Banks. He still complained of pain and tingling in his arms. Dr. Banks' assessment was extradural defect compatible with herniated disc disease at C-2,3. On March 1, 1982, Mr. Loftis was admitted to Cabrini Hospital for a cervical myelogram which again demonstrated an extra-axial defect at C-2,3 compatible with a possible bulging disc. On May 11, 1982, Mr. Loftis saw Dr. Banks. Although he indicated that he had some numbness in the lateral three toes of his left foot and occasionally his left leg gave out on him, he felt his condition was improving. On August 10, 1982, Mr. Loftis returned to Dr. Banks. Although he still had complaints about pain in his left arm and leg and stated that his left arm and leg occasionally gave out on him, Dr. Banks discharged him from active neurosurgery care.
The record indicates that Mr. Loftis was on disability until 1987, when he returned to truck work.
On June 6, 1991, James E. Campbell, director of the Louisiana Worker's Compensation Second Injury Board issued a letter to Commercial Union Insurance Company denying its claim for reimbursement for Mr. Loftis' injuries. The letter stated: "The employer has not established that it had any prior knowledge of the employee's pre-existing permanent partial disability (if any) prior to the subsequent injury of April 18, 1990, as is required by R.S. 23:1378(A)."
On July 23, 1991, Commercial Union Insurance Company appealed the decision of the Louisiana Worker's Compensation Second Injury Board. The hearing was set for March 2, 1994, at 9:00 A.M. At the time of the hearing, counsel for the Board was not present. At 9:15, the hearing officer decided to proceed without the representative of the Board. The officer stated "and let the record reflect that Carl Scott, attorney for the Louisiana Worker's Compensation Second Injury Fund, is not present for trial today. We delayed the hearing fifteen minutes and it is now 9:15 and we will begin without him." The hearing officer accepted four plaintiff's exhibits into evidence: (1) The medical records from the 1980 injury; (2) The medical records from the 1990 injury; (3) The Deposition of Mr. Kenneth Moran, Sr.; and (4) Records of compensation benefits paid by Commercial Union. Then, the hearing officer adjourned the hearing.
On March 30, 1994, Hearing Officer Van Hoof rendered judgment in favor of Commercial Union and ordered the Board to reimburse Commercial Union. She assigned written reasons:
[T]he medical records of Dr. John Patton, neuro surgeon [sic], indicate that the employee, Percy Loftis, sustained an accident in January, 1980, while cutting down a tree, when the butt of the tree fell on his head. He complained of tingling in the right hand, radiating into the forearm up to the level of the elbow. He also suffered from right hand weakness, for getfulness, headaches and a brief episode of right leg pain. A myelogram on May 7, *937 1981 revealed a bulge anteriorly at C2-3, with no significant nerve root compression. Mr. Loftis was treated conservatively and finally discharged from active neurosurgery care on August 10, 1982 with a diagnosis of C2-3 extradural defect compatible with herniated disc disease. On May 14, 1990, Mr. Loftis was seen by Dr. Douglas Waldman, orthopaedist, who knew the history of the second injury, falling off a truck while working. His diagnosis was cervical and lumbar strain. Loftis was treated conservatively. The deposition of Kenneth M. Moran, Sr. indicates that he has known Loftis for at least 15 years. When Loftis applied for employment with Ken Moran Trucking, he was asked about prior injuries and answered affirmatively. Plaintiff's exhibit No. 4 identifies all workers' compensation benefits paid by Commercial Union to Percy Loftis. The Second Injury Board offered no evidence to controvert the evidence presented on behalf of Commercial Union. Commercial Union is entitled to statutory reimbursement for all workers' compensation benefits paid. Written reasons assigned this 30th day of March, 1994 at Alexandria, Rapides Parish, Louisiana.
The Board timely perfected this appeal and assigned two errors: (1) The hearing officer erred in ordering the Fund to reimburse Commercial Union; (2) The defendant, Worker's Compensation Second Injury Board, was denied due process at the administrative hearing when the hearing officer proceeded without the defendant being present.

LAW
A party seeking reimbursement from the Second Injury Fund bears the burden of proving that paid compensation benefits meet the statutory requisites for reimbursement. Huval Baking v. Workers' Comp. Bd., 594 So.2d 1028, 1034 (La.App. 3d Cir.1992). To recoup benefits from the Second Injury Fund, a party must prove three elements: He must first establish that the employee had a pre-existing permanent partial disability at the time of the subsequent injury. LSA-R.S. 23:1378(A). Chandler Parts & Serv. v. Workers' Comp., 576 So.2d 1133, 1135 (La.App. 3d Cir.), writ denied, 580 So.2d 383 (La.1991); Crown Zellerbach v. La. Workmen's Comp., 481 So.2d 650, 652 (La.App. 1st Cir.1985), writ denied, 483 So.2d 1021 (La.1986). Secondly, he must clearly prove that the employer had actual knowledge of the permanent partial disability prior to the subsequent injury. LSA-R.S. 23:1378(A)(4). To satisfy this element, it must be established either that the employer knowingly hired a worker with a permanent partial disability or that the employer acquired actual knowledge of the permanent partial disability during the worker's employment (but prior to the subsequent injury) and retained the employee notwithstanding knowledge of the permanent partial disability. LSA-R.S. 23:1378(A); Chandler Parts, 576 So.2d at 1135-36; Southern Casualty Insurance Company v. Louisiana Workmen's Compensation Second Injury Bd., 478 So.2d 573 (La.App. 2d Cir.1985). Thirdly, he must prove that the employee incurred a subsequent injury arising out of and in the course of his employment, and that this subsequent injury merged with the preexisting permanent partial disability. LSA-R.S. 23:1378(A)(1); LSA-R.S. 23:1378(A)(3), Southern Casualty Insurance Company, 478 So.2d at 577. This last element requires that "the disabilities combine or act in concert to make the worker materially and substantially more disabled than if the worker only suffered from the second injury or condition." Southern Casualty Insurance Company, 478 So.2d at 577, quoted with approval in Huval Baking, 594 So.2d at 1033; Crown Zellerbach, 481 So.2d at 652. The standard of review to be applied on appeal in this case is manifest error. Alexander v. Pellerin Marble & Granite, 93-1698 (La. 1/14/94); 630 So.2d 706.
The hearing officer concluded that Commercial Union was entitled to reimbursement; however, we reverse because Commercial Union failed to prove the statutory requisites for compensation.

PERMANENT PARTIAL DISABILITY
On review, we find that the record is devoid of evidence that Mr. Loftis had a pre-existing *938 permanent partial injury at the time of the subsequent injury. A permanent partial disability is "any permanent condition, whether congenital or due to injury or disease, of such seriousness to constitute a hindrance or obstacle to obtaining employment." LSA-R.S. 23:1378(F). In the case sub judice, there is medical evidence that Mr. Loftis injured his back in January, 1980, and sought treatment from Dr. Patton and Dr. Banks for injuries he allegedly sustained as a result of the accident. However, these same medical records indicate that Mr. Loftis was discharged from active neurosurgical care on August 10, 1982. There is no evidence that Mr. Loftis sought medical treatment for back problems after August 10, 1982, or that any back problems persisted after the date of discharge. Additionally, there is no evidence of the existence of any back problems that were so serious that they limited Mr. Loftis' activities or constituted "a hindrance or obstacle to obtaining employment," which LSA-R.S. 23:1378(F) requires for a party to recoup benefits from the Second Injury Fund. American Gen. Fire. & Cas. v. Worker's Compensation, 604 So.2d 46 at 49 (La.App. 1 Cir.1992).
In his deposition, Mr. Moran testified that Mr. Loftis told him that he had hurt his back in 1980 when he interviewed him for a position with Ken Moran Trucking. However, he stated that Mr. Loftis did not tell him that he was disabled; rather, he testified that Mr. Loftis told him that "he was okay." He testified that Mr. Loftis failed to advise him of any restrictions that would interfere with his ability to perform his job as a trucker. Additionally, Mr. Moran testified that he believed that Mr. Loftis had explicitly told him that he had been released from a doctor's care for the 1980 injury. When asked about Mr. Loftis' on the job performance, Mr. Moran stated that Mr. Loftis was able to perform his normal job duties and that he failed to observe any obstacles or hindrances that interfered with Mr. Loftis' ability to work as a trucker.

EMPLOYER'S KNOWLEDGE
A party seeking to recover from the Second Injury Fund must clearly establish that the employer had actual knowledge of the employee's permanent partial disability prior to the subsequent injury. LSA-R.S. 23:1378(A)(4).
This statutory requirement is consistent with the stated purpose of the Second Injury Fund, which is "to encourage the employment of physically handicapped employees who have a permanent, partial disability ..." LSA-R.S. 23:1371(A). The goal of promoting the employment of disabled persons can only be attained if an employer actually knows that a job applicant or a worker currently in his employ has a permanent partial disability and he makes the conscious decision to hire or retain the individual. Hence, the requirement exists that one seeking to recover from the Second Injury Fund must clearly establish that the employer knowingly hired a worker with a permanent partial disability or that the employer acquired actual knowledge of the permanent partial disability during the worker's employment (but prior to the subsequent injury) and retained the employee.
Mr. Moran testified at deposition that he was not familiar with the particular accident that Mr. Loftis had in 1980 but that Mr. Loftis had told him that he had hurt his back. He stated that Mr. Loftis "did not tell me that he was disabled. He told me about his previous injury, but he says, I'm okay.... And he told me about he had hurt his back.... he might have told me how he hurt it ... then I questioned him about ... the injury and is he capable of working." Additionally, Mr. Moran testified that Mr. Loftis had told him that "he had ... previous back problems, but I'm okay." Mr. Moran stated that he asked Mr. Loftis "are you sure you're okay now?" To which, he stated, Mr. Loftis responded: "Oh, I'm fine, everything is okay."
Mr. Moran's deposition indicates that Mr. Loftis did not tell Mr. Moran about any pre-existing permanent partial disability at the time he was hired. Furthermore, Mr. Moran's testimony that Mr. Loftis was able to perform his normal job duties and that he failed to observe any obstacles or hindrances that interfered with Mr. Loftis' ability to work as a trucker demonstrates that Mr. *939 Moran did not acquire actual knowledge of any permanent partial disability while Mr. Loftis was working for him.
Thus, we find that Commercial Union failed to clearly establish that Moran Trucking had actual knowledge of any pre-existing permanent partial disability which Mr. Loftis may have had.

MERGER
Finally, it was incumbent upon Commercial Union to prove that Mr. Loftis had a pre-existing permanent partial disability and that a subsequent injury merged with this pre-existing condition.
The "merger of an injury with a preexisting permanent partial disability is limited to the following: (1) The subsequent injury would not have occurred but for the preexisting permanent partial disability; or (2) The disability resulting from the subsequent injury in conjunction with the permanent partial disability is materially and substantially greater than that which would have resulted had the preexisting permanent partial disability not been present."
In Southern Casualty Insurance Company, the second circuit stated: "The term `merger' has the connotation of two factors occurring in combination." 478 So.2d at 577, quoted with approval in Huval Baking, 594 So.2d at 1033.
As discussed above, the record demonstrates that Commercial Union failed to prove that Mr. Loftis was suffering from a permanent partial disability at the time of the subsequent injury. Based on this determination, it necessarily follows that Commercial Union has failed to prove "merger." Simply put, there can be no proof of a merger, or the combination of a pre-existing permanent partial disability with a subsequent injury, absent proof that a pre-existing permanent partial disability existed.
Even though Dr. Waldman wrote a letter dated January 29, 1991 in which he stated: "I do think Mr. Percy Loftis' on the job injury activated the pre-existing degenerative changes at C-2,3 level of his cervical spine," this medical opinion is not dispositive, because there is no proof that these pre-existing degenerative changes constituted a permanent partial disability. Am. Gen. Fire. & Cas., 604 So.2d at 49.

DECREE
For the foregoing reasons, we conclude that the hearing officer erred in ordering the Board to compensate Commercial Union; therefore, the judgment of the hearing officer ordering the Second Injury Fund to reimburse Commercial Union is reversed. Because we have determined that the first assignment of error requires reversal, we will not consider whether the Second Injury Board was denied due process when the hearing officer held a hearing without it. The costs of this appeal are assessed to Commercial Union.
REVERSED AND RENDERED.