JjSHORTESS, Judge.
This appeal requires us to decide if the Louisiana Workers’ Compensation Second Injury Board (defendant) should reimburse the Employers National Insurance Company (plaintiff) workers’ compensation payments paid by plaintiff to an injured employee who had a permanent partial disability when hired. The trial court ordered defendant to reimburse plaintiff, and defendant appeals.
The Louisiana Legislature enacted Revised Statutes 23:1371-78 to establish a special state fund called the Workers’ Compensation Second Injury Fund. Every property and casualty insurer, self-insured employer, and group self-insurance fund, authorized to transact business in Louisiana, makes an annual payment to this fund.[1] Defendant receives these payments and transmits them to the state treasurer. The state treasurer then credits the fund. La. R.S. 23:1377(B)(2). This fund pays defendant’s administrative expenses, and also reimburses these property and casualty insurers, self-insured employers, and group self-insurance funds for compensable claims.[2]
If an employee is injured while in the course and scope of employment, a property or casualty insurer, self-insured employer, or group self-insurance fund must generally pay compensation benefits to this employee according to Revised Statute 23:1031, et seq. But if an employer hires an employee with a preexisting disability and this employee becomes injured while in the course and scope of his latest employment, though a property or casualty insurer, self-insured employer, or group self-insurance fund must pay compensation benefits to the employee, they can apply to defendant for reimbursement from the fund for those benefits paid to this employee.[3]
To recoup benefits from defendant, a property or casualty insurer, self-insured employer, or group self-insurance fund must prove three elements: 1) that han employee had a preexisting permanent partial disabili *1276 ty when the employee incurred a later injury; 2) that the employer can clearly prove it had actual knowledge of this preexisting disability before the later injury; and 3) that the employee’s later injury, when coupled or. combined with the employee’s previous disability, makes the worker materially and substantially more disabled than if the preexisting disability had not been present.[4] In other words, the employee’s later' injury “merged” with the preexisting disability to augment the employee’s overall disabled condition.[5]

Facts

Randy Richard worked for Harmony Corporation (Harmony), a construction company and subsidiary of Turner Industries (Turner). He was a boilermaker welder and he earned $500.00 a week. On March 7, 1990, during the course and scope of his employment with Harmony, he began to climb a ladder but lost his footing. He fell to the ground, tore his right-knee anterior cruciate ligament, and could not work for months. Plaintiff was Harmony’s workers’ compensation insurer, and because of this injury, it paid Richard a total of $13,800.00 in compensation benefits and $54,132.91 for medical expenses. It also paid Richard $20,000.00 to settle a dispute over whether he was entitled to more benefits.
After paying weekly benefits to Richard, plaintiff applied to defendant for reimbursement according to Revised Statute 23:1378(A).[6] Defendant, however, denied plaintiffs reimbursement claim based on Revised Statute 23:1378(A)(4), which requires an employer to know of an employee’s permanent partial disability before it hires the employee.
Plaintiff contested defendant’s decision. At trial, both parties agreed Richard had a preexisting left-knee disability when he began working for Harmony. They agreed he later injured his right knee while working in the course and scope of his employment for Harmony. They also agreed his new right-knee injury [ .¡merged with his preexisting left-knee disability. Defendant, however, did not stipulate Harmony knew Richard had a preexisting left-knee disability when he began work.
Plaintiff argued it was entitled to be reimbursed because a Turner employee knew of Richard’s preexisting left-knee injury before Richard began working, and though Harmony may not have actually known about Richard’s preexisting condition, the Turner employee’s knowledge should be imputed to Harmony since it is one of Turner’s subsidiary corporations. The trial court agreed and imputed the Turner employee’s knowledge of Richard’s preexisting disability to Harmony, even though it had not formally hired Richard.
On appeal, defendant argues plaintiff is not entitled to be reimbursed because Harmony did not know Richard had a permanent partial preexisting disability before he began to work for Harmony.[7]
It alternatively argues Richard’s claim was not compensable because he did not truthfully complete a medical pre-examination form, the Second Injury Fund Questionnaire/Pre-employment Placement Questionnaire (Questionnaire). Since he did not answer truthfully,, defendant contends Richard forfeited his claim to benefits according to Revised Statute 23:1208.1.

Why it matters whether Richard’s “employer” knew of his preexisting disability before it hired him.

The legislature created the Louisiana Workers’ Compensation Second Injury Fund to encourage employers to hire physically-handicapped employees, who have a perma *1277 nent, partial disability.[8] It created an incentive whereby the fund would protect these self-insured employers, property and casualty insurers, and group self-insurance funds from paying excess compensation benefits when the employee’s later injury merges with the preexisting disability.[9]. So, if an employer hues or retains an employee who has a permanent partial disability, and this employee’s later on-the-job injury merges with the preexisting disability, the employer or its insurer can be reimbursed from the fund for all weekly ^compensation benefits payable after the first 104 weeks of payments,[10] for 50% of all reasonable and necessary medical expenses actually paid that exceeds $5,000.00 but are less than $10,000.00,[11] and for 100% of all reasonable and necessary medical expenses in excess of $10,000.00.[12] But the employer must clearly establish it had actual knowledge of the employee’s preexisting permanent partial disability “pri- or to the subsequent injury.”[13]

Did Harmony “know” of the preexisting left-knee disability?

Bryan Casebonne, a Turner medical technician, and the only witness at trial, worked in the medical screening unit within Turner’s central personnel office. He testified Turner’s personnel office controlled the “whole hiring process” for all its companies. Case-bonne described Turner’s hiring process like this: applicants learn about possible job openings and they go to either a Turner office or a Turner subsidiary office to apply for a job. If they appear at a subsidiary office, they are routed to Turner’s central personnel office. Once at this office, they axe grouped according to their craft. They then take a written skills test. If they pass this test, they can be interviewed. If they have a successful interview, they must still- be medically examined and take a drug test. If they pass these tests, then the Turner central personnel office hires them and assigns them to a particular Turner subsidiary company needing workers in them craft. The newly hired workers arrive at the jobsite with an identification card and a referral slip containing their biographical data, craft, and pay scale.
Casebonne said he examined each prospective non-union employee. If he found the applicant able to perform his craft adequately, then he would approve the applicant, and the applicant would eventually be sent to the appropriate jobsite. Otherwise, if he found an applicant was not physically capable of adequately performing the craft for which he applied, then he would refer the applicant to a medical doctor to obtain a medical release. He said he did not have the authority to end Turner’s consideration of an applicant once the applicant had made it to this l^point in “the hiring process,” unless the applicant lied about the applicant’s medical history on the Questionnaire.
Additionally, Casebonne said the Turner personnel office keeps all medical and personnel information for each non-union employee. The subsidiary company, Casebonne explained, may independently collect information and keep employee files, but each prospective non-union employee is approved by Turner’s central office and all information initially discovered from this “process” is kept at the Turner personnel office. Generally, the subsidiary company does not see the worker’s medical information. Once approved, the referral unit within Turner’s personnel office assigns the worker to a jobsite and supplies the worker with an identification card and a referral slip. In short, Case-bonne explained the individual subsidiary companies like Harmony do not hire applicants; Turner’s central personnel office hires them.
Casebonne testified that when he examined Richard, he learned about Richard’s 1985 left-knee injury, though the Questionnaire did not show he had prior knee trouble or knee surgery. Casebonne said that after *1278 talking with Richard and watching him squat and perform other bending tests to his left knee, he decided to approve Richard for work.
Defendant argues, however, Turner may-have known of Richard’s preexisting disability, but Richard worked for Harmony and it did not know about his left-knee disability. It argues the statute requires the employer to know about an employee’s preexisting disability before the employer hires the employee. Thus, the employer must prove to defendant that it knew about the preexisting disability before defendant will reimburse the employer or its insurer.
On the rationale of Willamette Industries, Inc. v. State Worker’s Compensation Second Injury Board,[14] the trial court ruled for plaintiff. In that case, Willamette Industries contracted with Earl Clark Logging Company to cut and haul timber. Ben Rodisch worked for Clark. Clark knew Rodisch had a preexisting injury to his left elbow before he hired Rodisch. While Rodisch was working, a ^falling log crushed his ankle. Because Clark’s insurer went into receivership and Clark later filed for bankruptcy, Willamette, as Rodiseh’s statutory employer, paid him compensation benefits. Willamette consequently requested defendant reimburse it according to Revised Statute 23:1378. Defendant refused because Willamette admittedly did not know about Rodisch’s preexisting elbow disability. The Willamette court held Clark’s knowledge of an employee’s preexisting permanent partial disability should be imputed to Willamette and it allowed Willamette to collect reimbursement payments from defendant. The court explained its decision:
This holding is supported by the very purpose of the statute which is to encourage a direct employer [independent contractor] to hire persons with permanent partial disabilities. This purpose would be defeated if statutory employers, who may eventually have to make worker’s compensation payments to an injured employee, are prevented from obtaining reimbursement by the Second Injury Fund because only the direct employer had actual knowledge of any such pre-existing injury. Should the [Second Injury] board’s interpretation of the statute be adopted, those in the position of statutory employers may encourage direct employers 'not to employ individuals with pre-existing partial disabilities. This would defeat the very purpose behind this statute.[15] (Emphasis added.)
Based on Casebonne’s testimony and the Willamette rationale, we agree with the trial court. In Willamette, knowledge was imputed from an independent contractor to the statutory employer. Statutory employers have a contractual relationship with their independent contractors. The relationship between Turner and Harmony, however, is much closer. Harmony Corporation is a subsidiary company of Turner Industries. A subsidiary company is one in which another corporation (i.e., parent corporation) owns at least a majority of the shares, and thus has control.[16] Here, Turner is the parent that controls Harmony. Moreover, Casebonne confirmed that Turner’s central personnel office hired Richard, not Harmony. The Willamette court correctly noted: “The statute contemplates a person in a position to hire and fire should have knowledge of the permanent partial disability.”[17] (Emphasis added.) To hold otherwise would impede the statute’s Igpurpose, which is to encourage employers to hire employees with preexisting disabilities.[18]
We impute Casebonne’s knowledge of Richard’s preexisting left-knee disability to Harmony. Plaintiff, as Harmony’s insurer, can recover the compensation payments paid to Richard. This assignment of error lacks merit.
*1279 Was Richard’s claim compensable?.
Defendant argues that since Richard did not disclose his prior left-knee injury and disability on the Questionnaire, plaintiff should not recover any payments because Richard was not initially entitled to receive compensation benefits. Defendant relies on Revised. Statute 23:1208.1, which reads in part:
Nothing in this Title shall prohibit an employer from inquiring about previous injuries, disabilities, or other medical conditions and the employee shall answer truthfully; failure to answer truthfully shall result in the employee’s forfeiture of benefits under this Chapter, provided said failure to answer directly relates to the medical condition for which a claim for benefits is made or affects the employer’s ability to receive reimbursement from the second injury fund.
Section 1208.1 applies to employment-related questioning of an employee or prospective employee, by the employer, concerning a pri- or injury, when there is no pending workers’ compensation claim.[19] According to 23:1208.1, if Richard did not truthfully answer the questions about his “previous injuries, disabilities, or other medical conditions,” he would have forfeited his right to recover compensation payments.
Though Richard did not note his preexisting disability on the Questionnaire, Case-bonne said he could not remember whether Richard voluntarily told him, or if he saw the surgical sear on Richard’s left knee. Regardless, Casebonne decided to continue with the process and offer Richard employment. This decision mooted any problem with the veracity of the Questionnaire.
Also, the Louisiana Supreme Court noted 23:1208.1 does not specifically apply to false statements made to defraud the workers’ compensation system to | pobtain benefits. It applies more to circumstances where the employer is prejudiced by a false statement 1) directly relating to the medical condition for which a claim for benefits is made, or 2) affecting the employer’s ability to receive reimbursement from the Second Injury Fund. If so, 23:1208.1 requires a claimant to forfeit the benefits he received.[20] The nondisclosure of Richard’s left-knee disability does not directly relate to the medical condition for which he made a claim for benefits, the right-knee injury, and did not affect plaintiffs ability to receive reimbursement from the Second Injury Fund because, as we noted above, it became irrelevant on this point after Casebonne’s interview and physical exam; it could not have prejudiced defendant. This error assignment lacks merit.
Conclusion
For the above reasons, we find the trial court correctly imputed knowledge about Richard’s preexisting disability to Harmony, so plaintiff can recover those payments made to Richard in accordance with Revised Statute 23:1378(A)(1) and (3)(a-b). We also find Richard’s claim is compensable. Defendant is taxed with the appeal costs.
AFFIRMED.

. La. R.S. 23:1377(B)( 1)

. La. R.S. 23:1377(A).

. La. R.S. 23:1378.

. Commercial Union Insurance Co. v. State Worker's Compensation Second Injury Board, 94-1202, p. 6-7 (La.App. 3d Cir. 3/1/95), 651 So.2d 933, 937; La. R.S. 23:1378.

. La. R.S. 23:1378(A)(1).

. Plaintiff requested it be reimbursed for 1) all weekly compensation benefits paid beyond the first 104 weeks of compensation, 2) 50% of all medical expenses paid, up to $10,000.00, and 3) 100% of all medical expenses actually paid or payable in excess of $10,000.00. La. R.S. 23:1378(A)(1) and (3)(a-b).

.La. R.S. 23:1378(A)(4).

. La. R.S. 23:1371(A).

. Id.

. La. R.S. 23:1378(A)(1).

. La. R.S. 23:1378(A)(3)(a).

. La. R.S. 23:1378(A)(3)(b).

. La. R.S. 23:1378(A)(4).

. 595 So.2d 1206 (La.App. 3d Cir.), writ denied, 600 So.2d 608 (La.1992).

. 595 So.2d at 1208.

. Black's Law Dictionary, p. 1428 (6th ed.1990).

. Willamette, 595 So.2d at 1208.

. See Commercial Union Insurance Co. v. State Worker's Compensation Second Injury Board, 94-1202, p. 9 (La.App. 3d Cir. 3/1/95), 651 So.2d 933, 938.

. Trench v. Harmony Const. Co., 95-1851, p. 4 (La.App. 1st Cir. 4/4/96), 672 So.2d 330, 332, writ denied, 96-1130 (La.6/7/96), 674 So.2d 973.

. Resweber v. Haroil Const. Co., 94-2708, p. 15 (La.9/5/95), 660 So.2d 7, 16; La. R.S. 23:1208.1.